UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 06-80656-Civ-Ryskamp/Vitunac

JAN BRONSTEIN, an individual,

        Plaintiff,

vs.

MARC BRONSTEIN, an individual,
VALUBUILD PANEL HOMES CORP.,
a Florida corporation, and AMERIPANEL
HOMES CORP., a Florida corporation,

        Defendant.

_____

MARC BRONSTEIN, an individual,
VALUBUILD PANEL HOMES CORP.,
a Florida corporation, and AMERIPANEL
HOMES CORP., a Florida corporation,

        Counter-Plaintiffs,

JAN BRONSTEIN, an individual a/k/a
"JAN BROWN" a/k/a JAN BROWN's
VALUBUILD PANEL HOMES CORP.,

        Counter-Defendant

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on Order of Reference (DE 20) from United States District

Judge Kenneth L. Ryskamp "for a hearing and proposed finding and recommendation." Before the

Court is Defendant/Counter-Plaintiff Marc Bronstein's Emergency Motion for Injunctive Relief (DE

12), filed on September 12, 2006. Jan Bronstein filed a response (DE 18) to this motion on

September 18, 2006. The Court conducted a hearing September 19-20, 2006. This matter is now



ripe for review.

### Defendant/Counter-Plaintiff's Motion for Preliminary Injunction

Defendant/Counter-Plaintiff, Valubuild Panel Homes Corp., ("VPHC") seeks a preliminary injunction to enjoin Plaintiff/Counter-Defendant from doing the following: (1) violating its trademark rights in "Valubuild Panel Homes Corp.," pursuant to the Lanham Act, by utilizing a confusingly similar name "Valubuild Panel Homes;" (2) infringing upon its Florida trademark rights under Fla. Sta. §495.131 by utilizing the mark "Valubuild Panel Homes;" (3) infringing upon its Florida common law trademark rights and unfairly competing by utilizing the mark "Valubuild Panel Homes"; and (4) violating the Anti-Cyberquatting Consumer Protect Act, 15 U.S.C. §1125(d) by the registration of multiple domain names confusingly similar to the domain name "valubuild.com."

VPHC argues in its Motion for Injunctive relief that if the Plaintiff/Counter-Defendant continues to advertise and promote his business under the Valubuild Panel Homes mark, then: (1) the public will be confused, misled and deceived as to the source and origin of the product and services; (2) the distinctive value and reputation of the VPHC mark has been diluted and will continue to be further diluted, impairing the value of VPHC intangible property; (3) the Plaintiff/Counter-Defendant will continue to unfairly benefit from the goodwill and commercial value enjoyed by VPHC in its protected marks; (4) VPHC will lose substantial revenues; and (5) VPHC's reputation will suffer should purchasers be dissatisfied with the Plaintiff's products and services mistakenly believing them to be those of VPHC.

### Plaintiff/Counter-Defendant's Reply in Opposition to Defendant Counter-Plaintiff's Motion for Preliminary Injunction

In opposition, Plaintiff /Counter-Defendant avers that Canadian Arctic Trading House, Ltd.

("CAT"), a Canadian corporation, is the rightful owner of the Valubuild Panel Homes ("VPH") mark. Plaintiff/Counter-Defendant contends that CAT, utilizing the Canadian registered tradename Valubuild Panel Homes, has seniority rights in the mark having been the first to use the mark. Further, the Plaintiff/Counter-Defendant alleges that the Defendant/Counter-Plaintiff fails to show the substantial likelihood to succeed on the merits requisite for the issuance of a preliminary injunction for the following reasons: (1) CAT is the rightful owners of the mark first and used the mark first; (2)  Defendant/Counter-Plaintiff cannot establish it owns the mark; (3) Lacking ownership rights in the mark VPHC cannot prevail on its claims for cybersquatting; (4) VPHC claims are barred by the affirmative defense of unclean hands; and (5) VPHC would not suffer irreparable harm were the Court to deny preliminary injunctive relief.

Evidentiary Hearing

A. Marc Bronstein

Marc Bronstein ("MB") testified that in March 2000 he incorporated Valubuild Panel Homes Corp., in the State of Florida to pursue the sale of prefabricated home kits. ( Exhibit 10).  MB maintains that he has continually been the sole shareholder and director of VBPH. (Composite Exhibit 11).[1]  According to MB, his sole ownership and control of the company had gone uncontested by the Plaintiff/Counter-Defendant, Jan Bronstein ("JB"), his father, until May of 2006.

MB testified that following VPHC's incorporation in Florida, he made CAT a non-exclusive sales agent for VPHC's products.  At that time, CAT was jointly owned by MB and JB. MB claims that VPHC provided CAT with sales leads obtained from VPHC's website www.valubuild.com and

---

[1] Composite Exhibit 11 includes a 9/18/2006 www.sunbiz.org public inquiry for Valubuild Panel Homes Corp.; and year 2001 through 2006 Uniform Business Reports (UBR) for VPHC from the State of Florida.

3

advertising.  In turn, Plaintiff/Counter-Defendant and other CAT employees sold VPHC products

to the leads.  The VPHC-CAT  relationship, according to MB, continued until May of 2006.

However, in May of 2006, MB testified that VPHC terminated CAT as its non-exclusive

sales agent as a result of "JB's poor performance and unprofessional conduct."  Following the

severance of the relationship, VPHC sent CAT a cease and desist letter advising JB and CAT to

cease and desist representing themselves as a VPHC's sales agent, and  to cease using VPHC's

trade secrets and proprietary information.  MB testified that following the aforementioned cease and

desist letter, JB instituted this law lawsuit in July of 2006.

In addition to initiating the lawsuit, MB stated that JB resorted to "self-help" following the

cease and desist letter.  Pivotal to VPHC's business is its internet site, www.valubuild.com, which

generates the preponderance of sales for the company. (Exhibit 1). MB testified that JB's formation

of a competing business using a confusingly similar name - Jan Brown's Valubuild Panel Homes

combined with JB's use of the internet to advertise that company is proof of JB's intention to divert

VPHC's business to his own entity.  MB stated that JB has registered variations of Valubuild's

domain name.  These names include: www.valubuild.net, www.valubuild.biz, www.valubuild.ca,

www.valubuild.us, and www.janbronsvalubuild.com. (Exhibits 2,3, and 4).  MB testified that the

aforementioned websites are substantially similar to the one used by his company, VPHC. (Exhibits

6, 7).  Furthermore, MB claims that JB references a Valubuild Boca Raton office to make VPHC's

office appear as a VPH location.

B. Jan Bronstein

JB testified that he is a citizen of Canada and the father of MB.  In 1998 JB was employed

by a company that specialized in prefabricated homes, and thereby gained knowledge and

4

experience in the prefabricated home product and business.  In December 1999, JB alleges that he approached his son with a proposal to go into the prefabricated home business together.  JB would provide the know how, the product, the marketing, and physical operation of the business and MB would provide the financing for the start up. At the time MB was employed full-time with a company in Florida.

JB returned to Canada and commenced to construct the new venture.  The new venture would utilize an existing Canadian Corporation formed in 1998 by JB, for which JB was sole shareholder of, called CAT. (Exhibit D).  In January 2000, JB created a name for the new venture "Valubuild Panel Homes" ("VPH").  On January 25, 2000, CAT registered the VPH name with the Ontario Ministry of Consumer and Commercial Relations. (Exhibit J).  Before registering the VPH name JB had on the recommendation of MB, hired a web developer to secure the internet domain name www.valubuild.com.  JB testified that the initial registration of the www.valubuild.com domain name was by the web developer, Denni Freidman.

JB testified that he started building the "product" that was to be called VPH as soon as he returned from the meeting with his son in Florida in December 1999.  JB stated that he created the product line for VPH by actually drafting the different home models. Testimony presented to support JB's creation of the product included: Product Line Catalog (Exhibit Q); Installation Guide (Exhibit R); and Price List (Exhibit P).  Additionally, JB stated that he created the supply chain requisite to create the VPH product.  JB testified that VPH hired the web designer and developer Denni Friedman to create and launch a website to drive sales and interest to VPH.  Denni Freidman was paid for the design and launch of the www.valubuild.com website by two checks drawn on VPH's

Royal Bank of Canada account (Exhibit K).[2]

On February 16, 2000, JB testified that as sole shareholder and President of CAT he issued one hundred (100) shares of CAT stock to MB (Exhibit E) thereby making MB a fifty percent shareholder in the corporation. Additionally, on February 16, 2000 MB was elected a Director of CAT pursuant to the provisions of the Canadian Business Corporation Act. (Exhibit F). MB signed two additional corporate documents on February 16, 2000. The first appointed MB secretary of the CAT Corporation (Exhibit H) and the second was a Certificate and Consent affirming MB's citizenship and permanent residence in Canada and intention to act as a Director of CAT. (Exhibit G). JB testified that during this stage of the business set-up MB expressed a desire to be President of CAT. JB stated that he did not want to relinquish the position to his son.

JB testified that he and his son (MB) recognized it would be an asset to the venture to have a Florida Company with a U.S. address and the ability to negotiate checks in U.S. currency. The goal of the parties was to put a U.S. "face" on the business venture. JB testified that a decision was reached that CAT would incorporate in the state of Florida and MB would be President of the Florida corporation. JB stated that the business plan was that "Florida would be basically nothing more than a mailbox" and the entire business would be run, under CAT in Canada. JB further stated that on March 8, 2000, MB incorporated VPHC in Florida and sent to his father a Statement of Organization by Incorporator signed by MB and dated March 16th, 2000. (Exhibit C). This Statement established CAT as the sole director of the corporation. JB stated that after reviewing this

---

[2] VPH opened three (3) bank accounts in Canada following the registration of the VPH tradename and 50/50 split of the company with MB. A Royal Bank Corporate Customer was presented to the Court that included a statement signed by MB stating that: (1) the ownership of CAT as 50% MB, 50% JB; (2) CAT was operating under the tradename VPH; (3) JB was President, MB was Secretary of CAT. (Exhibit A).

document he made no further inquiries into the organizational structure of the Florida company, because MB was his son, and he trusted his son.

JB testified that the www.valubuild.com website went "live" on the internet on March 7, 2000, one day before the corporation papers for VPHC were signed by MB. The intent of the website according to JB was "that it would serve as our product catalog/brochure . . . so that the world would know we're doing business as Valubuild."

The www.valubuild.com website site featured three phone numbers for customers to contact VPH. JB testified that the subscriber for one of those numbers was CAT, and the other two numbers were telephone numbers that had previously been assigned to JB. When customers called these 800 numbers the calls went directly to VPH in Toronto, Canada. JB stated that on March 7, 2000, the same day the website went live, he commenced customer telemarketing solicitation. JB indicated that the website was fully integrated into the VPH sales process, as he would instruct prospective customers to go to the website to view further information about VPH and its products.

JB testified that MB had a minimum role in VPH during the year 2000. In fact, JB testified that in 2000 the VPHC operation in Florida was nothing more than a "postal mailbox" and a telephone in MB's home that was on call forward to the VPH office in Canada. Furthermore, JB stated that MB had a full-time job in the United States during 2000 which he kept until 2001 when MB joined the VPH venture. However, JB testified that during this time MB was providing the financial support promised to VPH in the original agreement. JB represented that he initially invested approximately $3500 (Canadian dollars) in VPH to register the name, purchase a computer, locate space and make the physical improvements necessary to open an office. The additional financing for the venture was provided to VPH by MB via his credit cards.

7

Beginning in May 2000, JB placed newspaper ads in US papers advertising the VPH product. The cost for these advertisements were charged to MB's personal credit cards. Ads were placed in West Virginia and North Carolina newspapers in May 2000 (Exhibit L). JB stated that although the ads did not carry a company name, they did use the 800 phone number registered to CAT. JB acknowledged that the order form used to place the ads carried the VPHC and not the VPH name and the Florida address. JB explained that "we represented ourselves as a Canadian company with a Florida office and Florida bank account." Responses to the advertisements were tracked by JB in a form called SIPS lead form (Exhibit M).

JB testified that business was "lousy" during the first year of the venture and that by August 2000, MB had "maxed" out his available credit. JB stated that his wife agreed to mortgage her home and use $25,000.00 of the proceeds to pay off MB's credit card debt and place the remaining $12,500.00 in the company.[3] This amount was later repaid to JB's wife.[4] The company's first sale was made in May 2000 by JB (Exhibit 9). The sale was later cancelled. JB stated that the contract form utilized to make the sale carried the VPHC name. JB further testified that he signed the contracts on behalf of the seller VPHC as he was acting as an owner of CAT.

JB testified that it was the company's intent to use the legal entity (the Florida corporation) as a "front." JB recounted that the first home actually sold and shipped occurred in December 2000. According to the business plan, the funds received from sales were made payable to VPHC and then

---

[3] The company (CAT, VPH, VPHC) who ultimately received these funds was not identified.

[4] Testimony did not clearly establish whether VPH, CAT or VPHC repaid JB's wife.

8

transferred from VPHC Florida to Canada.[5]  JB presented and explained a sales list which he

prepared for this litigation from VPH and VPHC documents that reflected every sale from 2000

through 2004. (Exhibit N).  JB stated that for the first two years business was bad and revenue was

small.  MB handled the dollars for the business, and then forwarded compensation from the

company to CAT, never paying JB directly.  For years 2000, 2001, 2002 money was tight and JB

contends that he had to plead with his son for money.[6]  JB testified that all the sales on the sales list

(Exhibit N) for year 2000 were made in Canada, and that the first sale by MB in Florida occured in

April 2001.

JB testified that it was not until MB quit his job that they (MB/JB) decided to open an office

in Florida.  JB further stated that in support of that decision he traveled to Florida with office

partitions and physically aided in the construction of the office.   Even after the Florida office

opened sales and operations continued in Canada, with Canada responsible for the vast majority of

sales.  In May/June 2003 VPHC hired its first sales people.  In December 2003 JB traveled to

Florida to train these sales persons.  However, JB contends that in year 2003 only a "handful of

---

[5] The testimony did not establish which account and company in Canada received the
funds wired from sales/income receipts received by VPHC in Florida.  Both JB and MB testified
that funds disbursed to JB went to CAT.  However, the issue of other funds transferred between
the two corporations was not fully explored.

[6] Neither party presented financials,  accounting documents, or tax returns attesting to
what income was received by each company from the sales generated by the two parties efforts.
Neither party disclosed the amounts of compensation he received from efforts pertinent to this
litigation.  No discussion of how shareholder profits were distributed in CAT, VPH and VPHC
was presented.  JB characterized the money he received from MB on behalf of VPHC as
management fees, however both parties acknowledge that those funds were directed to CAT.
Additionally, it is undetermined when and how MB was able to receive income in the United
States as the incorporation documents of VPHC establish that salary to MB was predicated on
MB's obtaining a visa to remain in the Country and a work permit.

sales" resulted from the Florida operation. In year 2004 sales "took off" - and JB characterized this as "his best year ever." JB testified that parts of the operation were transferred to the Florida office as it grew, with the Florida office eventually having a "lion's share of the operation." However, JB testified that the two operations (Canada and Florida) continued to interchange functions and operations, with the entire operation of Florida shifting back to Canada in years 2004 and 2005 as a result of the hurricanes in Florida.

JB testified that in year 2004, MB reduced the amount of money paid/disbursed to him. The issue of the amount of money due JB became a source of conflict between MB and JB. JB testified that eventually MB choose to resolve the conflict, by disconnecting the long-standing 800 telephone numbers from the Canada office and moving them to MB's Florida office.

DISCUSSION

Trademark actions are common venues for the issuance of preliminary injunctions. See Int'l Cosmetics Exchange, Inc. v. Gapardis Health & Beauty, Inc., 303 F.3d 1242, 1246 (11th Cir. 2002)(quoting Levi Strauss & Co. v. Sunrise Int'l Trading Co., 51 F.3d 982, 985 (11th Cir. 1995). A district court should grant injunctive relief if the moving party shows: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the harm an injunction may cause the non-movant; and (4) that granting the injunction would not disserve the public interest. E. Remy Martin & Co., v. Shaw-Ross, 756 F.2d 1525, 1530 n.13 (11th Cir. 1985); Palmer v. Braun, 287 F.3d 1325, 1329 (11th Cir. 2002).

"A preliminary injunction is a powerful exercise of judicial authority in advance of trial. The chief function of a preliminary injunction is to preserve the status quo until the merits of the

controversy can be fully and fairly adjudicated." <u>Northeastern Fla. Chaptter of the Ass'n of Gen.</u> <u>Contractors v. City of Jacksonville</u>, 896 F.2d 1283, 1284 (11th Cir. 1990). The burden of persuasion rests on the movant. <u>Id</u>. at 1285. Movant's "showing of irreparable harm is 'the *sine qua non* of injunctive relief. <u>Id</u>. (citation omitted). Thus, the injury suffered by the movant must be "neither remote nor speculative, but actual and imminent." <u>Id</u>. In addition, an injury is "irreparable" only if it cannot be remedied by money damages. <u>Ferrero v. Associated Materials, Inc.</u>, 923 F.2d 1441, 1449 (11th Cir. 1991).

A.    <u>Likelihood of Success on the Merits</u>

Under the likelihood of success on the merits inquiry the Court has followed Eleventh Circuit precedent holding that the word "substantial" does not add to the "quantum of proof" required, rather the appropriate standard is if it is "probable" or "likely" that the movant will succeed on the merits. <u>Shatel Corp. v. Mao Ta Lumber & Yacht Corp.</u>, 697 F.2d 1352,1356 (11th Cir. 1983).

*<u>Count 1.  Trademark Infringement Violation Under §43(a) of the Lanham Act</u>*

At the outset, it is important to note that neither VPHC (the movant) nor VPH has registered the "Valubuild Panel Homes" trademark under the United States federal registration system. Therefore, neither party can claim nationwide protection under the federal statute. <u>Tally-Ho, Inc.</u> <u>V. Coast Community College Dist.</u>, 889 F.2d 1018, 1022 (11th Cir. 1989). To succeed on the merits of a claim under the Lanham Act, 11 U.S.C. § 1125 (the Lanham Act) VPHC must establish that it owns a protectable trademark that has been infringed. <u>Ivestacorp, Inc. v. Arabian Inv. Banking</u> <u>Corp.</u>, 931 F.2d 1519, 1522 (11th Cir. 1991). To establish a protectable interest when the trademark has not been registered with the United States Trademark and Patent Office VPHC must prove by a preponderance of the evidence that it owns the mark. <u>Gift of Learning Inc., v. TGC, Inc.</u> 329 F.3d

11

792, 797 (11th Cir. 2003). Typically, senior claims are dispositive in the protectable trademark interest inquiry. Id. at 797.

"Section 43(a) of the Lanham Act forbids unfair trade practices involving infringement of trade of trade dress, service marks, or trademarks, even in the absence of federal trademark registration." Planetary Motion v. Techsplosion, Inc., 261 F. 3d 1188, 1193 (11th Cir. 2001). Section 43(a) provides in pertinent part:

> (a) Civil action.
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or . . . 11 U.S.C. § 1125.

The Eleventh Circuit has established that in a trademark infringement action under Section 43(a) of the Lanham Act substantial likelihood of success on the merits is demonstrated by: (a) a showing that the movant has prior rights in the mark or name at issue, and (b) that the defendant (non-movant) adopted a mark or name that was the same, or confusing similar to the movant's mark, such as that consumers were likely to confuse the two. Id. at 1193.

In the present case it is uncontested that CAT has prior use of the mark or name at issue. Both parties acknowledge the registration of the VPH mark by CAT in Canada on January 25, 2000 (Exhibit J). CAT asserts that its prior use vests a senior right and claim to the mark which should be dispositive in the trademark interest inquiry. Gift of Learning Inc., 329 F.3 at 797. To defeat

12

VPH's senior right in the mark and to succeed on the merits, MB and VPHC contend that VPH: (1) fails to show senior rights sufficient to support vested priority usage of the mark in the United States, because of VPH's strictly foreign use of the mark in Canada ; and (2) fails to present more than a ministerial use of the mark which is insufficient to attach vested seniority rights.  VPHC contends that it will succeed on the merits because although VPHC was not the first appropriator of the name, VPHC was the first to utilize the trade name in commerce via sales and shipments to customers in the United States.

Two trade names have been presented before this Court by the parties, "Valubuild Panel Homes," and "Valubuild Panel Homes Corp.," and each party contends that he is the rightful owner of the mark and as such should be afforded the protection of this Court.  JB contends on behalf of CAT that VPH is the senior mark.  JB's son, MB, contends that VPHC is the first mark used in commerce and therefore the vested trademark.  It is uncontested that father and son entered into a business venture in February 2000 in Canada that involved the sale of prefabricated homes.  However, from that time forward the efforts of father and son in the prefabricated homes business are inextricably intertwined between two corporations, one Canadian, and one incorporated in the State of Florida.  Each corporation presented tangible testimony to this Court to support its claim of ownership in the mark and its claim ownership in the www.valubuild.com website.  However, the father-son relationship underlying the business operations failed to create a conclusive paperwork trail.  No agreements between the parties were presented.  No contracts between the parties were presented. Few corporate documents were presented and it is apparent that corporate formalities were scant in both corporations.  The most telling testimony came from JB when he stated that it was the intention of the parties to intertwine facially the business operation to put a U.S. face on what

13

was a Canadian operation. The consequences of their plan are now before the Court, and the Court

looks to the testimony and conduct of the parties for guidance as to whether there is a likelihood of

success on the merits of MB's claim to ownership and a protectible interest in the VPHC mark.

### (a) Prior Rights in the Mark or Name - Use in Commerce

Trademark ownership rights under common law are "appropriated only through actual prior

use in commerce." Tally-Ho, Inc. v. Coast Community College Dist., 889 F.2d 1018, 1022 (11th Cir.

1989). The "talismanic test" for "use in commerce" is whether or not the use is "sufficiently public

to identify or distinguish the marked goods in an appropriate segment of the public mind as those

of the adopter of the mark." New England Duplicating Co. v. Mendes, 190 F.2d 415, 417 (1st Cir.

1951). The Eleventh Circuit has recognized that in a trademark infringement action the phrase "use

in commerce" has two distinct contexts: (1) "use in commerce" under the Lanham Act which

denotes the authority of Congress under the Commerce Clause; and (2) "use in commerce" sufficient

to vest ownership rights in the mark. Planetary Motion Inc., v. Techplosion, Inc., 261 F.3d 1188,

1195 (11th Cir. 2001). The Eleventh Circuit requires that to prevail in an infringement action and

recover against subsequent users of a mark both contexts of "use in commerce" must be established.

Id.

The first context of "use in commerce" relates to Congress's authority under the Commerce

Clause to regulate commerce under the Lanham Act broadly defined as "all commerce which may

lawfully be regulated by Congress." Id. The "use in commerce" requirement of the Lanham Act is

a jurisdictional predicate to any law passed by Congress. Steele v. Bulova Watch Co., 344 U.S. 280,

283 (1952). "The nature of the Internet indicates that establishing a typical home page on the

14

Internet, for access to all users, would satisfy the Lanham Act's 'in commerce' requirement."[7] Planetary Motion, 261 F.3d at 1195 quoting Planned Parenthood Fed'n of Am. v. Bucci, 1997 U.S. Dist. LEXIS 3338, 10-11 (D.N.Y. 1997).

It is likely that VPH will be found to be the first user of the mark to fulfill the "jurisdictional predicate" of "use in commerce" pursuant to Eleventh Circuit precedent. Planetary Motion Inc., v. Techplosion, 261 F.3d 1188, 1195 (11th Cir. 2001).[8] On March 7, 2000, a website launched on the world wide web, titled www.valubuild.com., to sell pre-fabricated homes.  JB testified that the www.valubuild.com website was developed by him in conjunction with web designer/developer Denni Freidman.  JB testified that the website was designed as VPH's catalog to the world  featuring the product line, company information, and 800 phone numbers for customer inquiries.   The subscribers attached to the 800 phone numbers featured on www.valubuild.com were CAT and JB. JB's testimony that www.valubuild.com launched the day before MB submitted the VPHC incorporation papers to the State of Florida was uncontested by MB. The Court finds that VPH's website, which featured a home page, product catalog and phone numbers is sufficient to satisfy the Lanham's Act's jurisdictional predicate of use in commerce pursuant to Eleventh Circuit precedent. Planetary Motion, 261 F.3d at 1195.

To determine the second context for "use in commerce," which inquires "whether a party has

---

[7] The Internet and world-wide web (www) is a global network of interconnected computers facilitating communication and commerce between individuals businesses and organizations around the world. The Web, is the most widely used and fastest-growing part of the Internet except perhaps for electronic mail ("e-mail")." United States v. Microsoft, 147 F.3d 935, 939 (D.C. Cir. 1998).

[8] Counsel for MB/VPHC ignored Eleventh Circuit precedent concerning internet usage to satisfy the jurisdictional predicate of the in commerce inquiry and argued at the evidentiary hearing that CAT has no protectible U.S. rights in the mark (which would fail to satisfy the jurisdictional predicate of use commerce) because all VPH's usage was in Canada and is therefore immaterial to the inquiry.

established prior use of a mark sufficient to establish ownership," the Eleventh Circuit has adopted a two part test from the First Circuit. Id. To prevail a party must establish "[e]vidence showing, first adoption, and second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark, is competent to establish ownership, even without evidence of actual sales." New England Duplicating Co. v. Mendes, 190 F. 2d 415, 418 (1st Cir. 1951).

In Planetary Motion, the Eleventh Circuit established that the inquiry of ownership sufficient to vest a mark right "is made on a case by case basis, considering the totality of the circumstances." Id. quoting Johnny Blastoff, Inc. v. L.A. Rams Football Co., 188 F. 3d 427, 433 (7th Cir.). "Under the totality of circumstances" analysis, a party may establish "use in commerce" even in the absence of sales. Id. In fact, the "existence of sales or lack thereof does not by itself determine whether a user of a mark has established ownership rights therein." Planetary Motion, 261 F.3d at 1196. In the present case, the Court considered the totality of circumstances pursuant to Eleventh Circuit precedent in Planetary Motion to determine ownership of the Valubuild Panel Homes trade name sufficient to vest protectible interests in the mark. Planetary Motion, 261 F.3d at 1195. The Court, under the totality of circumstances inquiry, weighed the following to determine ownership sufficient to vest trade mark rights in this matter: (i) corporate formation and claims of competing ownership of the trade name; (ii) product; (iii) first showing of adoption in "use in commerce"; and (iv) de minius/token use.

### i.     Corporate Formation and Claims of Competing Ownership

In the present case, the following is undisputed between the parties: (1) that on January 25, 2000, VPH was registered in Canada with the Ministry of Consumer and Commercial Relations as

16

the trade name for the Canadian Corporation titled Canadian Arctic Trading House Ltd. (Exhibit J); (2) that JB was the sole shareholder and officer of CAT at the time of VPH's registration; (3) that on February 16, 2000, JB issued one hundred shares (100) of CAT common stock to MB (Exhibit E); (4) that the one hundred CAT common shares MB received represented a 50% percent ownership in the company.

The Court finds that the conduct of the parties following the registration of the VPH trade name, and 50/50 ownership split of CAT stock, supports JB's testimony that the intention of the CAT shareholders was to establish an active venture under the VPH tradename.[9] The predicate of a trademark infringement action is ownership in the mark. Ivestacorp Inc., 931 F.2d at 1522. Here, CAT has established the predicate ownership in the VPH mark as of January 25, 2000.

MB asks this Court to defeat CAT's claim of first ownership of the mark by showing that he incorporated VPHC in the State of Florida, and that VPHC was the first to utilize the trade name VPHC "in commerce". Additionally, MB asks this Court to recognize that VPHC's certificate of registration of the VPHC trade name under Fla. Stat. §495 is prima facie evidence of ownership of the mark. While VPHC's certificate of registration is compelling testimony, it is not conclusive as to ownership of the mark because: (1) the registration occurred after the commencement of this litigation, and (2) registration pursuant to Fla. Stat. §495 specifically recognizes prior common law claims in the mark like VPH's claim.

Underlying the inquiry as to who owns the mark, VPH or VPHC, is the inquiry as to who owns the Florida Corporation - VPHC. The Articles of Incorporation of VPHC, (Exhibit 10) reflect

---

[9] This is supported by JB's testimony hat following the formation and ownership split of VPH the parties obtained an office, opened bank accounts in VPH's name, obtained a computer, and began designing the product and promotional material to launch the company.

filing with the Secretary of the State of Florida on March 10, 2000.  The incorporator is shown as

Mark H. Schaeffer, and the registered agent is shown as MB.  MB testified that he has always been

the sole shareholder of VPHC, and that JB and CAT were never shareholders or directors of VPHC.

Two stock certificates were presented as proof of MB's sole ownership of VPHC. (Exhibit 8).

These stock certificates, signed by MB, do not carry a date.[10]

The Court found JB's testimony refuting MB's claim to sole ownership and directorship of

VPHC to have merit. JB testified that the VPHC Statement of Organization by Incorporator (Exhibit

C) which is signed by MB, dated and notarized March 16, 2000, establishes CAT as the only duly

elected Director of VPHC. JB further testified that MB forwarded this document to him shortly after

incorporating VPHC in Florida.  This document, JB testified is consistent with the business plan of

the two shareholders of CAT.  Furthermore, MB's inconsistent testimony concerning CAT's role

as a director of VPHC raises questions concerning the validity of MB's testimony on this important

topic. Under cross-examination MB acknowledged that he was incorrect in his prior testimony that

CAT was never a shareholder or director of CAT.  MB explained that CAT was not a "legally

recognized" director.  MB further stated that CAT as a corporation (and not a natural person) could

not serve as a director of VPHC. CAT is shown as a director of VPHC pursuant to the document

signed by MB on March 16, 2000. (Exhibit C).  However, the Minutes of the First Meeting of Board

of Directors of VPHC, dated March 21, 2000, show only one director present - MB (Exhibit 16).

MB offered no explanation as to how MB was elected or appointed Director of the VPHC

Corporation prior to its first organizational meeting.  It is uncontested by MB that five days prior

to the first meeting of the board of directors of VPHC, that MB sent to his father the Statement of

---

[10] One certificate shows 1,000 shares issued (which conforms to total authorized issue)
and the other certificate incorrectly shows the company name where the shares issued should be
shown. (Exhibit 8).

Organization of VPHC showing CAT as the only director. Somehow between March 16, 2000 and March 20, 2000, CAT was removed as a director of the corporation, before the first meeting of the Board of Directors. However, no corporate formalities were presented that reflect the substitution. MB did not testify as to when he discovered that CAT was not qualified to act as a director of VPHC, nor did he testify as to having informed his father of the same. Additionally, the Minutes of the First Meeting of VPHC reflect the election of MB as President with salary authorized upon approval of a E-2 Visa and INS employment and authorization. (Exhibit 16).

MB asks this Court to disregard the absence of corporate formalities, written agreements and contracts and accept instead his subjective intent as verification of sole ownership of VPHC. To support this MB stated that he incorporated VPHC in Florida as the sole shareholder because his father had a history of poor financial management and therefore he did not want to go into business with his father. MB testified that he paid for the incorporation in Florida. Further, MB reiterated to the Court that the arrangement between VPHC and CAT was that CAT would be the non-exclusive sales agent for the prefabricated homes business of VPHC.[11] The Court inquired of MB, why he accepted one hundred shares of CAT stock representing fifty percent (50) ownership in the CAT company with his father on February 16, 2000, and then some weeks later on March 8, 2000, refused to be involved in business ownership with his father due to his father's troubled financial past, however that question remains unanswered.

To establish a protectable interest in the VPHC mark when the trademark has not been registered with the United States Trademark and Patent Office, VPHC is required to "prove by a preponderance of the evidence" that it owns the mark. Gift of Learning Inc., v. TGC, Inc. 329 F.3d 792, 797 (11th Cir. 2003). The parties conflicting and convoluted claims of ownership in the Florida

[11] No formal agreement or contract was presented to document the actual relationship between VPHC and CAT as the non-exclusive sales agent of VPHC.

19

Corporation remain unresolved.[12] Therefore, the Court finds that VPHC has not shown a substantial likelihood to succeed on the merits of its ownership claim in the mark given the presence of the senior claim of VPH, and given CAT's potentially legitimate ownership interest in VPHC. The issue as to ownership of VPHC and hence ownership in the mark are questions which are best left to the trier of fact.[13]

### (ii) Product

The "talismanic test" for protection of a mark is whether the product - the goods are identified and distinguished in commerce by the mark that is sought to be protected. New England Duplicating Co. 190 F.2d at 417. Without a product, there is nothing for a mark to protect. In the instant action, both parties, simultaneously claim ownership to the same "product" - which consists of various prefabricated home models, product assembly guidelines, and product pricing.

JB testified that he created the "product" that both parties present as their own.[14] JB testified that he designed and drafted the prefabricated homes "product" between January 2000 and March 2000. JB testified that the "product" he created consisted of home plans, product specifications, installation guidelines, pricing sheets, and marketing materials. JB further testified that he provided these elements to the web designer/developer to include on the www.valubuild.com internet site which was launched prior to the incorporation of VPHC.

This testimony was not refuted by MB and VPHC. Moreover, MB and VPHC failed to

---

[12] MB's incorporation of the Florida company, stock certificates, and corporate filings weigh in favor of MB's sole ownership of the Florida corporation and hence the VPHC mark. However, common sense, the testimony of JB, the conduct of the parties following formation of VPH, combine with the testimony that CAT was an original director of VPHC, and the inconsistent testimony of MB as to CAT being a director, balance in favor of CAT's legitimate ownership interest in VPHC.

[13] MB retains an ownership interest in the mark no matter who prevails in this litigation. If CAT prevails then MB is a 50% owner of VPH, if VPHC prevails then MB is 100% owner of the VPHC mark.

[14] JB testified that he created the product on behalf of CAT.

20

present testimony evidencing how VPHC acquired proprietary interests in the product created and designed by CAT. MB did not testify that VPHC purchased, inherited or acquired the product line from CAT. The consistent testimony of MB was that CAT was only the non-exclusive sales agent of VPHC. However, to accept this theory, that CAT was only the non-exclusive sales agent, given that the proprietary product ownership most likely resides with CAT, is then to leave VPHC without a product to afford protection by trade name.

The only testimony offered by MB and VPHC to defeat JB and VPH's claim to the product line was a 2005 Valubuild Product Line Catalog. (Exhibit S).  This catalog carried the VPHC logo and name on the cover and then contained the following statement inside " [t]his booklet is the exclusive property of Valubuild Panel Homes Corp." (Exhibit S).  On page one of the 2005 catalog a model home called Ranch R24* 28 appeared with the following rights information at the bottom of the page "© 2003 Valubuild Panel Homes Corp." (Exhibit S).  An earlier version of the product line catalog features that exact model, with the exact name Ranch R24* 28. (Exhibit Q).  However, this earlier catalog carries the following rights information at the bottom of the page "© 2001 Valubuild." Id. Further, the Product Line Installation Guide carries the logo for VPHC, but carries the following rights information at the bottom of the page "Copyright 2001 © Valubuild Panel Homes." (Exhibit R).

The Court finds convincing the uncontested testimony that JB is the creator and designer of the prefabricated home product at issue in this litigation. Furthermore, it is unclear to the Court how VPHC came to possess the product it seeks to protect with the VPHC mark. The Court finds that on the testimony presented it is not probable  that VPHC will prevail as the sole owner of the product at issue.

*(iii) First Showing of Adoption in "Use in Commerce"*

Both parties concur that trademark ownership rights under common law are "appropriated only through actual prior use in commerce." Tally-Ho, Inc. v. Coast Community College Dist., 889 F.2d 1018, 1022 (11th Cir. 1989). However, the parties present disparate interpretations as what "use in commerce" entails. VPHC relies on a 1980 case from the Eastern District of Pennsylvania and contends that use in commerce involves not only the sale of the product in commerce with tradename identification, but also a primary inquiry as to what the public perceives as the legal entity behind the name and a secondary inquiry as to what the parties intent was as to public perception of the legal entity behind the mark. General Business Services, Inc., v. G. Parke Rouse, III, 495 F. Supp. 526, 534 (E.D. PA. 1980). MB testified that VPHC was always the in privity with the ultimate buyer of the product, and that CAT, trading as VPH, was never in privity with ultimate buyers. This testimony stands unrebutted by JB. To the contrary, JB alleges that it was the intention of the parties to form VPHC in the United States with the corporate purpose of having the ability to transact in the U.S., with a U.S. address and U.S. (dollar) depository abilities.

The Court finds that VPHC has failed to recognize a significant body of precedent from the Eleventh Circuit embracing a broader view of the "use in commerce" requirement. Importantly, the Eleventh Circuit, in a widely cited decision, Planetary Motion, states that "the existence of sales or lack thereof does not by itself determine whether a user of a mark has established ownership rights therein." Planetary Motion, 261 F.3d at 1196. In Planetary Motion, the Eleventh Circuit determined that the "use in commerce" inquiry should be both demonstrative of the mark's deliberate and continuous common law usage and indicative of use of the mark sufficient to provide association with the product and notice. Id.[15] "Although evidence of sales is highly persuasive, the

---

[15] Relying on the Seventh Circuit holding that "a higher quantum of use may be necessary to establish ownership rights under common law than under the statute because the notice

question of use adequate to establish appropriation remains one to be decided on the facts of each case . . . ." <u>Planetary Motion</u>, 261 F. 3d at 1196 quoting <u>New West</u>, 595 F.2d at 1200.

In <u>Planetary Motion</u> the Eleventh Circuit looked to other circuits for guidance as to what facts are relevant to the "use in commerce" inquiry. Advertising connected with extensive promotion has been found to vest priority rights in a mark. <u>Marvel Comics, Ltd. V. Defiant</u>, 837 F. Supp. 546, 548-49 (S.D.N.Y. 1993) (holding that rights in a new comic book were secured by announcement in 13 million comic books plus distribution of 1,500 brochures at a comic book convention even though no sales were established). Advertising supported by promotional mailers and distributor solicitations can vest rights in a mark where mere advertising alone may not. <u>Mendes</u>, 595 F.2d at 1200. Advertising through a catalogue may prove adequate to vest rights in a mark. <u>Lands' End, Inc. v. Manbeck</u>, 797 F. Supp. 511, 514 (D. Va. 1992) (holding that a catalogue is "by no means mere advertising" because a customer can easily associate the product with the mark, and distinguish the product from others). <u>See also</u> <u>T.A.B. Systems v. Pactel Teletrac</u>, 77 F.3d 1372, 1375 (Fed. Cir. 1996) (holding that a fact-finder can rely on advertising brochures, catalogues, ads, press and trade publications to "determine whether the public identifies the mark with a particular product or service); <u>Cascades of Levitt Homes, Inc. v. Cascades of Sabatello Dev. Corp.</u>, 43 U.S.P.Q. 2d 1920 (S.D. Fla. 1997) (holding that use of a mark in a press release and pre-contract with no showing of associated press coverage fails to create priority in the mark). "As long as there is a genuine use of the mark in commerce . . . ownership may be established even if the first uses are not extensive and do not result in deep market penetration or widespread recognition." <u>Allard Enterprises, Inc. v. Advanced Programming Resources</u>, 146 F. 3d 350, 358 (6th Cir. 1998).

The Court does not accept the limited view of the "use in commerce" inquiry proposed by

---

function of registration is lacking." <u>See</u> <u>Zazu Designs v. L'Oreal</u>, S.A. 979 F.2d 499, 503-504 (7th Cir. 1992).

MB and VPHC. The Court will not consider sales or the lack thereof as dispositive in this inquiry. Planetary Motion, 261 F.3d at 1196. Rather, sales are highly persuasive. Id. Once again, the intertwining of the two corporations renders a clear conclusion as to "seller" impossible at this stage of the litigation. VPHC is without doubt the legal entity that sold the product. (Exhibit 14). JB testified that VPH - under CAT was the sole source of sales from inception through 2001, and then the majority source of sales until 2004. VPHC's name is on the sale contract. However, JB testified that he entered into the contracts, signed the contracts, and sent out the contracts. JB further testified that VPHC's only role in the first years of the venture was to receive contract funds and then wire the funds to VPH/CAT in Canada. Important to the "sales" consideration is the fact that it is uncontested that VPHC did not have a sale until May 2000.

The www.valubuild.com website went live on March 7, 2000, before VPHC incorporated in Florida.[16] It is uncontested by MB and VPHC that immediately upon www.valubuild.com going live JB began telephone solicitation to a customer list in his possession from a previous employer. JB testified that his telemarketing efforts typically involved calling the prospect, introducing the company, and asking the prospect to refer to the website for product line information and details. Both parties acknowledge that advertising in support of the www.valubuild.com website commenced in May 2000. JB testified that the advertising was consistent with the business plan of the CAT shareholders, which was that JB would launch the company and do all the work and advertising for the company, and MB would finance the venture. While advertising standing alone is insufficient to vest ownership rights via "in commerce" use, VPH's use of the internet to market its product is

---

[16] To defeat VPH's claim of "first showing of adoption of the trade name in commerce," MB testified that he was the registrant of the domain name www.valubuild.com. However, this information is not dispositive to the inquiry for two reasons. First, MB was a 50% shareholder in CAT at the time of the website preparation and launch. Second, the website development and launch pre-date the incorporation of VPHC. VPHC cannot claim prior rights in the mark via MB's personal involvement in the development of the website.

24

more than mere advertising.  In the words of JB the internet was VPH's "catalog to the world" and like Land's End, Mendes, and T.C.P., the catalog, and internet marketing was creating an association between the trade name and the product.  Use of the VPH mark, on the internet and supported by direct telemarketing by JB, while not extensive is probable to be found as sufficient to vest ownership and protectible rights in the mark. Conversely, VPHC, like the Cascades, having its first mark usage on contracts most likely will not prevail as the first appropritor of the name in commerce. Cascades of Levitt Homes, Inc. v. Cascades of Sabatello Dev. Corp., 43 U.S.P.Q. 2d 1920 (S.D. Fla. 1997)  The Court finds that VPH's use of the mark in commerce on the internet which included a home page and product catalog, to be the most probable first usage of the name in commerce which would vest VPH with a senior claim to the mark.

   *(iv) de minius/token use.*

   Trademark rights are not conveyed through mere intent to use a mark commercially. Planetary Motion, 261 F.3d 1188, 1194, quoting Allard Enters. v. Advanced Programming Resources, Inc., 146 F.3d 350, 356 (6th Cir. 1998); Zazu Designs v. L'Oreal, S.A., 979 F.2d 499, 504 (7th Cir. 1992).  Both intent to use a mark and the "mere preparation to use a term as a trademark" creates "no rights a competitor is bound to respect." Hydro-Dynamics, Inc. v. George Putnam & Co., 811 F.2d 1470, 1473-74 (Fed. Cir. 1987).  Additionally, de minimis uses or token use may not establish trade mark rights.[17]  See Paramount Pictures Corp. v. White, 31 U.S.P.Q. 2d 1768 (BNA).

   In the present case, the Court finds that VPHC can only establish de minimis uses or token uses for the mark during year 2000. De minimis and token use is insufficient to vest seniority rights

---

[17] Congress amended the Lanham Act in 1988 and redefined the term "use in commerce" to mean the "bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a mark." Trademark Law Revision Act (TLRA), Pub. L. No 100-667, 102 Stat. 3935 (1988).

in the mark. Id.  Although, MB may have intended to use VPHC commercially in the future, it is

uncontested that during the year 2000 and for a portion of 2001, while MB was employed full-time,

the only use of VPHC was on the contract for sale which was generated by CAT for the product.

VPHC had no office, no equipment, no employees, no product - it was just a shell to receive money

from the product and sales made by CAT.  The Court finds that it is probable that VPHC will be

found to have no rights that a senior rights holder and competitor such as VPH will be bound to

respect, as VPHC can only show intent to use the mark in years 2000 and 2001.

<em><u>b. Likelihood of Confusion</u></em>:

Likelihood of confusion is a factual question determined by analysis of a number of factors,

including: (1) the strength of the plaintiff's mark; (2) the similarities between the plaintiff's mark and

the allegedly infringing mark; (3) the similarity between the products and services offered by the

plaintiff and the defendant; (4) the similarity of the sales methods; (5) the similarity of advertising

methods; (6) the defendant's intent; and (7) the "most persuasive factor" on likely confusion "is

proof of actual confusion." <u>Conagra</u> at 1514.

In the present case, the Court's determination that VPH will probably be found to be the

senior rights holder of the mark forecloses the necessity to investigate the similarities between the

two mark's and the possibility of confusion.  Both parties acknowledge the likelihood of confusion

between the competing marks and their respective internet sites.   Additionally, both parties

acknowledge that the same product, same promotions, and literally the same business is represented

by each party on their respective website. The Court finds however, that the parties have conducted

business with each other under the multiplicity of VPH and VPHC from 2000 through this year. The

testimony of JB and MB reveals father and son's intentional planning to structure the business at

issue in this litigation as two separate but "same" corporations.  The Court finds that MB and JB

26

intentionally used the corporations interchangeably.  MB and JB testified that at times one corporation did a particular task and at another time the other corporation did a particular task; that they shifted operations from Canada to Florida and then back again; and that they shifted money from Florida to Canada.  MB and JB were successful in their plan and today the two corporations are intertwined in such a manner that it is impossible to recognize one without the other.

For all the foregoing reasons, the Court finds that VPHC is not likely to succeed on the merits of Count I - Trademark Infringement in Violation of §43(a) of the Lanham Act.  The Court finds that that because VPHC is not likely to successfully demonstrate prior ownership rights in the name or mark at issue and prior use of the name or mark in commerce VPHC will probably not prevail in its trademark infringement claim.

*Count 2.  Trademark Infringement Under Florida Statute §495.131 and*

*Count 3.  Florida Common Law Trademark Infringement and Unfair Competition*

Fla. Stat. §495 governs the utilization of a trade mark within the geographic region of Florida.  Tally-Ho, Inc. 889 F.2d at 1022.  Trademark infringement is set forth under Fla. Stat §495.131 as:

> Use, without the consent of the registrant, any reproduction, counterfeit, copy, or colorable imitation of a mark registered under this chapter on any goods or in connection with the sale, offering for sale, distribution or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive as to the source or origin of such goods or services; or
> (2) Reproduce, counterfeit, copy or colorably imitate any such mark and apply such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used upon or in conjunction with the sale, offering for sale, distribution or advertising in this state of goods or services;

The Florida Trademark Act, however, explicitly preserves common law rights in marks acquired in

good faith as set forth in Fla. Stat. §495.161:

> Nothing herein shall adversely affect or diminish the rights
> or the enforcement of rights in marks acquired in good faith
> at any time at common law.

A registered mark has prima facie validity but is subject to another's bona fide use of the same or similar mark under the common law. Tally-Ho, Inc., 889 F.2d at 1023-1024 "The statute does not abrogate the common law rights of owners of marks." Id. In the present case, VPH's common law usage of the VPH mark can be dispositive of senior vested rights in the mark. Id.

"Florida state courts have adopted the federal criteria for assessing likelihood of confusion in trademark cases. Therefore, the analysis for the first consideration, likelihood of success on the merits, is the same for both counts." The Cascades of Levitt Homes v. The Cascades of Sabatello Dev. Corp., III, 1997 U.S. Dist. LEXIS 17095 (D. Fla. 1997) relying on Great Southern Bank v. First Southern Bank, 625 So. 2d 463 (Fla. 1993).[18] The present case is similar to Cascades in that it involves both a Lanham Act violation and a Florida Trademark Act violation, as such the consideration of one, per Cascades is sufficient for the other count. Id. "The Florida Trademark Act ... explicitly preserves common law rights in marks acquired in good faith." Tally-Ho, Inc., 889 F.2d at 1023 (11th Cir.) The Eleventh Circuit has determined that the "legal standard for federal trademark and unfair competition, and for common law trademark infringement," are essentially the same. Id at 1024.

This Court, following Eleventh Circuit precedent finds that VPHC is not likely to succeed on the merits of Court 2 - Trademark Infringement under Florida Statute 495. 131. The Court arrives at this conclusion because as previously determined in Count 1 - VPHC is not likely to

---

[18] The movant in the instant case, and the plaintiff in Cascades, alleged the identical causes of action for trademark infringement (1) violation of the Lanham Act, and (2) violation of Section 495.131 of the Florida Statutes.

succeed on the merits as VPH is likely to demonstrate ownership, and a senior prior use of the mark in commerce. This Court further finds that VPHC is not likely to succeed to the merits of Count 3 - Florida Common Law Trademark Infringement and Unfair Competition because as previously determined in Count 1 - VPH is likely to demonstrate ownership and a senior prior use of the mark sufficient to defeat VPHC's claim.

<u>Count 4.  Cybersquatting in Violation of 15 U.S.C. §1125(d)</u>

The Anti-Cybersquatting Consumer Protection Act of the Lanham Act, 15 U.S.C. § 1125(d)(1)(A) establishes that:

> [a] person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section , if, without regard to the goods or services of the parties, that person -(i) has a bad faith intent to profit from that mark, including a personal name which is protected as mark under this section; and (ii) registers, traffics in , or uses a domain name that . . . (I) is identical or confusing similar to the mark.

To be eligible for protection under 15 U.S.C. §1125(d)(1)(A) MB and VPHC must establish ownership of a trademark protected under the Lanham Act.  This Court determined that VPHC is not likely to succeed on the merits of its Lanham Act violation claim because VPH is likely to demonstrate ownership, and a senior prior use of the mark in commerce.  Ownership of a tradename protected under the Lanham Act is a predicate for protection from cybersquatting. 15 U.S.C. §1125(d)(1)(A).  Therefore, the Court finds that VPHC is not likely to succeed on the merits of Count 4 - Cybersquatting, as VPHC has not established ownership and a senior prior use predicate to protection under the Act.

<u>B. A Substantial Threat of Irreparable Injury:</u>

The Eleventh Circuit has held that "a sufficiently strong showing of likelihood of confusion [caused by trademark infringement] may by itself constitute a showing of . . . [a] substantial threat

of irreparable harm." <u>Remy Martin & Co. v. Shaw-Ross Int'l Imports</u>, 756 F.2d 1525, 1530 (11th Cir. 1985); <u>See also</u> <u>Tally-Ho, Inc. v. Coast Community College Dist.</u>, 889 F.2d 1018,1029 (11th Cir. 1989)(holding that a substantial likelihood of confusion is a substantial threat of irreparable injury).

In the instant case, VPHC has not made a showing that it is likely to prevail on the merits of a Lanham violation because VPH is likely to demonstrate ownership and a senior prior use of the mark in commerce.   The movant (MB and VPHC) has not been found to make a prima facie showing of trademark infringement, irreparable harm cannot be presumed. <u>McDonald's Corp. v. Robertson</u>, 147 F.3d 1301, 1310 (11th Cir. 1998). It has been established that "[t]he most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods." <u>Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.</u>, 846 F.2d 1079, 1092 (7th Cir. 1988).

In the instant case, the Court cannot find that "corrosive or irreparable harm" can be attributed to the loss of control of goods or products by either party in this action. <u>Id</u>.  MB and JB have interchangeably conducted business as one, and have sold the same product from the inception of the venture. VPHC and VPH had the same phones, the same address, the same product, and the same marketing materials from the onset of the venture until the commencement of this litigation. The Court finds that irreparable harm is not likely to flow from any injuries that result from the course of action of both parties.

C.   <u>Balancing Test - Threatened Injury to Movant Outweighs the Harm of Injunction:</u>

In balancing the potential harms, the Eleventh Circuit inquires if the probable loss of consumer goodwill for the movant outweighs the costs of delay to the defendant who will not be able to sell the product (using the mark) until a decision on the merits is reached. <u>Davidoff & CIE</u>

30

v. PLD International, 263 F.3d 1297, 1304 (11th Cir. 2001). In the present case, the Court finds that in balancing the interests of both parties, VPHC and VPH, that both corporations are likely to share an equal burden of harm. If the Court grants the preliminary injunction, then VPH and JB are left without a business enterprise to generate income. If the Court does not grant the injunction then VPHC might lose sales and income to VPH. The Court remains unconvinced that failure to issue a preliminary injunction will result in damage to the goodwill of VPHC.

D.   Public Interest:

The Eleventh Circuit has found that the public interest will be served by an injunction "by avoiding confusion in the marketplace." Davidoff & CIE, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1304 (11th Cir. 2001). Further, the Eleventh Circuit recognized that the Lanham Act "protects [consumer] expectations by excluding others from using a particular mark and making consumers confident that they can purchase brands without being confused or misled.. . . the Lanham Act also protects trademark owners." Id. at 1301. In the present case, the parties created confusion in the marketplace when by plan they intertwined the two corporations at issue so as to create one face to a product which has two corporations behind it. This Court finds that the public interest will not be disserved because VPHC is not likely to succeed on the merits of its Lanham Act trademark infringement claim as VPH is likely to demonstrate ownership and a senior prior use of the mark in commerce.

RECOMMENDATION

Based on the foregoing reasons, this Court RECOMMENDS to the District Court that the Movant's Emergency Motion to for Injunctive Relief (DE 12) be DENIED.

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable United States District Judge Kenneth L. Ryskamp, within ten (10) days after

31

being served with a copy. <u>See</u> 28 U.S.C. § 636(b)(1)(C).  Failure to file timely objections may limit

the scope of appellate review of factual findings contained herein.  <u>See</u> <u>United States v. Warren</u>, 687

F.2d 347, 348 (11th Cir.1982) <u>cert. denied</u>, 460 U.S. 1087 (1983).

    DONE and SUBMITTED in Chambers at West Palm Beach in the Southern District of

Florida, this _____ day of October 2006.

ANN E. VITUNAC
UNITED STATES MAGISTRATE JUDGE

Copies to:
Honorable Kenneth L. Ryskamp
Counsel of Record